## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FLOR JAZMIN CARRASCO,

Petitioner,

Civil No. 12-268 MV-WDS

vs.

DANIEL CARRILLO-CASTRO,

Respondent.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Petition For Return of Child to Petitioner [Doc. 1] and Respondent's Motion for Summary Judgment and Supporting Memorandum [Doc. 20]. The Court, having considered the Petition, Respondent's Motion, the relevant law and being otherwise fully informed, finds the Petition is well-taken and will be **GRANTED**, and Respondent's Motion is not well-taken and will be **DENIED**.

## BACKGROUND

Petitioner Flor Jazmin Carrasco ("Flor") and Respondent Daniel Carrillo-Castro ("Daniel") are both from Mexico. The parties met in Albuquerque, New Mexico, and began a romantic relationship in September 2006. Transcript of May 3, 2011 Hearing ("Tr.") at 5:6-8.[1] They began living together shortly thereafter. In 2007, their son, N.C., was born. *Id.* at 4:18-25.[2]

---

1       As no official transcript of the hearing has yet been ordered by either party, the Court cites herein to a rough transcript. The parties may order an official transcript. Note that the page and line numbers in the official transcript may differ from those referenced here.

2       For privacy protection, the Court refers to the parties' minor son by his initials only, and includes only the year of his birth.

Flor, Daniel and N.C. lived together as a family in Albuquerque until January 2010, when the parties separated.  *Id.* at 5:14-16.  Flor testified that they separated because of domestic violence:  Daniel would beat her up, and hurt her.  *Id.* at 6:16-19.  At the time of their separation, Flor and N.C. remained in the family home, and Daniel moved out.  *Id.* at 5:18-25.  Soon thereafter, Flor and N.C. moved in with a sister of their social worker for one month, and then moved in with Flor's sister in Los Lunas, New Mexico, where they lived until June 2010.  *Id.* at 6:1-15.  During that period, Daniel saw N.C. on weekends, and had regular telephone contact with him.  *Id.* at 6:20-23; 54:21-24.

In June 2010, Flor and N.C., with Daniel's consent, left for Chihuahua, Mexico.  *Id.* at 9:17-18.  Both parties testified that they did not discuss a specific date on which Flor and N.C. would return to the United States.  *Id.* at 9:3-5; 73:19-21.  According to Flor, in advance of that trip, she told Daniel on several occasions that she wanted to move back to Mexico to be near her family, and intended to find a place to live and work there.  *Id.* at 7:2-10; 9:6-8.  With regard to the June trip in particular, Flor testified that she told Daniel that she planned to look for a place to live and a job while she was in Mexico, and that if she found a job, she might not return to the United States.  *Id.* at 7:12-16; 10:2-3.  According to Daniel, Flor told him she had already gotten a job in Mexico, and that she and N.C. would live there while she was working.  *Id.* at 56:9-13.  He further testified that although they did not discuss how long Flor and N.C. would be in Mexico, it was supposed to be temporary, "for a relatively short time."  *Id.* at 56:14-19.  According to Daniel, he told Flor that he did not want N.C. to live in Mexico, and that Flor assured him that she and N.C. would return to Albuquerque in several months.  *Id.* at 57:2-9.

While they were in Mexico, Flor and N.C. lived with Flor's mother in Chihuahua.  *Id.* at 10:21-22.  Until January 2011, Flor's mother cared for N.C. while Flor was at work.  *Id.* at

10:14-18.  Beginning in January 2011, N.C. attended a daycare center in the mornings and stayed with Flor's mother in the afternoons.  *Id.* at 13:9-10; 33:24-25.  N.C. spent time with family at social gatherings, and played with cousins and friends from the neighborhood.  *Id.* at 18:8-13.  His health was good, and according to Flor, he had a regular doctor that he saw every month.  *Id.* at 18:14-18.  Daniel spoke to N.C. almost daily.  *Id.* at 17:14-16; 59:20-22.

In September 2010, Flor sent N.C. to Albuquerque with her mother to see Daniel.  *Id.* at 10:4-9.  Flor picked N.C. up at the end of the visit and brought him back to Mexico.  *Id.* at 10:10-11.  In November 2010, Flor's mother again brought N.C. to Albuquerque to see Daniel. *Id.* at 10:23-11:2.  Flor, too, came to Albuquerque at that time, and stayed with her sister.  *Id.* at 10:3-5.  N.C. stayed with Flor for the month of November and the first two weeks of December. *Id.* at 10:6-8.  He stayed with Daniel for the last two weeks of December for the holidays.  *Id.* at 41:2-4.  While N.C. was with Flor, he saw Daniel daily.  In November, Flor took N.C. for a check-up with his primary care physician in Albuquerque.  *Id.* at 32:20-23.

Daniel testified that during Flor's stay in Albuquerque, she advised him that she intended to remain in Mexico, where she had gotten a good job.  *Id.* at 60:11-16; 61:3-6.  The parties together decided to enter into a written agreement regarding N.C.'s care and the distribution of their assets.  *Id.* at 11:24-12:1.  Flor testified that the intent of the agreement was for N.C. to stay with her in Mexico, and to prevent future problems with visitation.  *Id.* at 12:6-10.  Daniel similarly testified that he entered into the agreement in order to "stay in contact" with N.C. while he and Flor were in Mexico.  *Id.* at 61:10-12.  He further testified that he understood that Flor would stay in Mexico, and while she was in Mexico, she would guarantee that he would see his son.  *Id.* at 82:23-25.  Accordingly, on November 4, 2010, the parties entered into a written agreement, which was signed and notarized.  The agreement provides as follows:

-3-

By means of this document, we the interested parties Flor Jazmin Carrasco Lopez and Daniel Carrillo Castro arrived at an agreement as to the care of our son [N.C.].  In which we understand that for every 2 months that [N.C.] spends living with his mom Flor Jazmin Carrasco in the city of Cuahutemoc Chihuahua.  The following month he shall spend in the care of his dad Daniel Carrillo Castro in the city of Albuquerque New Mexico.

In addition in this document we record how our assets were distributed as of our separation.

1.      automobile model Hyundai Elantra 2001
2.      Home furnishings, in addition to $7,000

They became the belongings of Flor Jazmin Carrasco Lopez and [N.C.] (son).

Together with a monthly allowance of $150 per month by way of support for [N.C.] starting as of our separation which occurred on the date of December of the year of 2009.  Up until the current date.

It being mutually agreed.

Petitioner's Ex. 1.

The agreement did not include any time limits on the arrangement for N.C.'s care, or any date on which Flor and N.C. would return to the United States.  Despite his testimony that Flor advised him of her intention to remain in Mexico, where she had gotten a good job, Daniel also testified that he believed the agreement would be temporary, and that he repeatedly asked Flor to move back to Albuquerque.  *Id.* at 61:13-14, 3-4; 75:4-5.  Daniel provided no factual basis, such as evidence that Flor's job was a temporary position, to support his testimony as to the temporary nature of Flor's stay in Mexico.

Both parties testified that they understood the agreement would have to change when N.C. started school. *Id.* at 30:21-25; 83:8-10.  Flor testified that she told Daniel that once N.C. started school, N.C. should visit Daniel during school vacations.  *Id.* at 30:23-25.  However, Flor also testified, as did Daniel, that Daniel had always intended for N.C. to attend school in the

-4-

United States, and had made that intention known to Flor.  *Id.* at 31:14-16; 32:1-3; 61:21-62:6.
When asked in what grade he thought N.C. would start school, Daniel responded, kindergarten.
*Id.* at 85:3-5.

Flor and N.C. returned to Mexico at the end of December 2010.  In keeping with the
parties' written agreement, in March 2011, Flor sent N.C. to Albuquerque with her mother to see
Daniel.  *Id.* at 13:14-24.  N.C. remained in Albuquerque for one month, and then returned to
Mexico.  *Id.*

Although, pursuant to the parties' written agreement, N.C. was to spend the month of
June 2011 with Daniel, N.C. did not travel to Albuquerque at that time.  Flor testified that she
did not bring or send N.C. to Albuquerque both because Daniel had threatened to keep N.C. in
the United States if she did, and because neither Flor nor her mother was able to bring N.C. to
the United States.  *Id.* at 14:5-8; 15:3-4.  Specifically, Flor's visa had expired and she was unable
to procure a new visa, and Flor's mother was unavailable.  *Id.*  The Court finds Flor's testimony
credible.

Flor testified that for approximately one week in June, she and N.C. traveled to an area
that made it difficult to have telephone contact.  *Id.* at 34:16-35:5.  According to Flor, she told
Daniel in advance about the trip.  *Id.*  On the other hand, Daniel testified that he was unable to
reach N.C. by telephone for approximately one week, and had not been advised by Flor that they
would be traveling and unreachable.  *Id.* at 65:2-9.  Daniel testified that because he had not heard
from N.C., he decided that N.C. should stay with him in the United States, and sought legal
assistance to effectuate that decision.  *Id.* at 65:10-66:9.

Flor testified that after June 2011, Daniel changed.  *Id.* at 15:24-16:1.  He stopped
threatening her and "became nice" again.  *Id.*  In September 2011, in keeping with the parties'

written agreement, Flor sent N.C. to Albuquerque with her sister.  *Id.* at 16:6; 36:15-17.  Flor

expected that Daniel would send N.C. back to her at the end of the month.  *Id.* at 16:16-25.  At

that time, N.C. spoke no English.  *Id.* at 42:12-16.

Although the parties' agreement required him to return N.C. to Flor at the end of

September, Daniel refused to allow N.C. to return to Mexico.  *Id.* at 68:5-7; 16:9-11.  Flor

testified that Daniel told her at the end of September that he was not going to send N.C. back.

*Id.* at 17:1-8.  Consistent with Flor's testimony, at one point in the hearing, Daniel admitted that

he decided to retain N.C. at the end of September and then began a custody proceeding so that

Flor would not find out about the proceeding until it was too late for her to refuse to send N.C. to

see him.  *Id.* at 77:7-15.  At another point in the hearing, Daniel provided contradictory

testimony that he had told Flor in August that he intended to start a custody proceeding, and that

she would not be able to take him back to Mexico at the end of September.  *Id.* at 80:24-81:14.

Daniel testified that Flor "knew perfectly well what [he] was going to do" before she sent N.C.

to the United States.  *Id.*  The Court does not find credible Daniel's testimony that Flor knew in

advance of the September trip that he intended to keep N.C.  This testimony is simply not

believable, and is inconsistent with Flor's testimony, which the Court finds credible.

In November 2011, Daniel filed in the Second Judicial District Court, State of New

Mexico, a Petition to Establish Parentage, and to Determine Child Custody, Timesharing, and

Child Support Obligation, in which he sought primary physical custody of N.C.  Doc. 1, Ex. C.

In that proceeding, Daniel specifically requested that the state court enter an order prohibiting

the removal of N.C. from the United States.  Accordingly, on November 15, 2011, the state court

entered a temporary order prohibiting the removal of N.C. from the State of New Mexico by one

parent without the written consent of the other parent.  Doc. 12-1.

Since sending him to Albuquerque in September 2011, Flor has spoken to N.C. daily, but has not been able to see him. Tr. at 17:20-23. Flor attempted to travel to Albuquerque in November 2011, but was unable to enter the United States. *Id.* at 36:21-25. To date, Flor has been unable to procure the necessary documents to travel to the United States.

On March 13, 2012, Flor filed the Petition, seeking, *inter alia*, an order directing prompt return of N.C. to Mexico, his habitual residence, and an order directing Daniel to pay her legal costs and fees. Doc. 1. On April 10, 2012, Daniel filed an answer denying the allegations in the Petition. Doc. 12. On April 20, 2012, the Court held a telephonic status conference. *See* Doc. 17. Thereafter, on April 27, 2012, Daniel filed a motion for summary judgment. Doc. 21. On May 1, 2012, Daniel submitted a memorandum regarding the relevance of immigration status to the determination of habitual residence. On May 2, 2012, Flor filed a response to Daniel's motion for summary judgment, Doc. 22, in addition to a memorandum of law regarding N.C.'s habitual residence, and the effect of Daniel's undocumented status. Doc. 21.

On May 3, 2012, the Court held an evidentiary hearing at which both parties testified. After hearing testimony and argument, the Court took custody of N.C.'s travel documents, and reserved its ruling on the Petition and Respondent's Motion.

## JURISDICTION UNDER THE HAGUE CONVENTION

The Hague Convention on the Civil Aspects of International Child Abduction "seeks to deter parents who are dissatisfied with current custodial arrangements from abducting their children and seeking a more favorable custodial ruling in another country." *Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007). Generally, it "creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody." *Id.*

-7-

Both the United States and Mexico are signatory nations to the Hague Convention.  *A.A.M. v.*

*J.L.R.C.*, __ F. Supp. 2d __, No. 11-CV-5732, 2012 WL 75049, *4 (E.D.N.Y. Jan. 9, 2012).  The

International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*,

"implements the Hague Convention in the United States and grants federal and state courts

concurrent original jurisdiction of actions arising under the Convention." *Navani*, 496 F.3d at

1124 (citation omitted).  The ICARA "empowers the courts in the United States to determine

only rights under the Convention and not the merits of any underlying child custody claims."  42

U.S.C. § 11601(b).  The Hague Convention directs the Court to "act expeditiously in

proceedings for the return of children."  Hague Convention, Art. 11.

## DISCUSSION

I.    Overview

Under the Hague Convention, the Court is mandated to return a child to his

circumstances "prior to the abduction if one parent's removal of the child from or retention in a

Contracting State has violated the custody rights of the other and is, therefore, 'wrongful.'"

*Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995) (citing Hague Convention, Art. 12).  The

removal or retention of a child is "wrongful" where it is "in breach of rights of custody attributed

to a person. . . either jointly or alone, under the law of the State in which the child was habitually

resident immediately before the removal or retention" and, at the time of removal or retention,

"those rights were actually exercised, either jointly or alone."  *Id.* (citing Hague Convention Art.

3).  To establish a prima facie case of wrongfulness, a petitioner is required to show by a

preponderance of the evidence that: (1) the respondent removed the child from his "habitual

residence"; (2) the removal or retention was in breach of the petitioner's custody rights under the

laws of the state of the child's habitual residence; and (3) the petitioner was exercising those

rights at the time of removal or retention.  *Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002).

 Once a petitioner satisfies his burden of establishing a prima facie case of wrongful removal or retention of a child, the child *must* be returned to his State of habitual residence unless the respondent establishes one of four defenses.  *Friedrich v. Friedrich ("Friedrich II")*, 78 F.3d 1060, 1067 (6th Cir. 1996).  Two of these defenses can be established by a preponderance of the evidence: "the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment, Hague Convention, Article 12; or, the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, Hague Convention, Article 13a."  *Id.*  The other two defenses must be shown by clear and convincing evidence: "There is a grave risk that the return of the child would expose it to physical or psychological harm, Hague Convention, Article 13b; or, the return of the child 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms,' Hague Convention, Article 20."  *Id.*

 All four of the exceptions are "narrow," and are "not a basis for avoiding return of the child merely because an American court believes it can better or more quickly resolve a dispute."  *Id.*  The federal court "retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."  *Id.*

II.      Flor's Prima Facie Case

    A.      Habitual Residence

        1.      Legal Standard

The term "habitual residence" is "not defined by either the Hague Convention or the

ICARA." *Kanth v. Kanth*, 232 F.3d 901, 2000 WL 1644099, *1 (10th Cir. Nov. 2, 2000).

Rather, a child's habitual residence "is defined by examining specific facts and circumstances."

*Id.* Accordingly, the inquiry into a child's habitual residence "is a fact-intensive determination

that necessarily varies with the circumstances of each case." *Whiting v. Krassner*, 391 F.3d 540,

546 (3d Cir. 2004). Ultimately, the determination of a child's habitual residence is a mixed

question of fact and law. *Id.*

The federal circuit courts have interpreted the term "habitual residence" differently. In

*Feder*, the Third Circuit held that a child's habitual residence is "the place where he or she has

been physically present for an amount of time sufficient for acclimatization and which has a

'degree of settled purpose' from the child's perspective." 63 F.3d at 224. Specifically, in

deciding whether a place constitutes a child's habitual residence:

> There must be a degree of settled purpose. The purpose may be one or there may
> be several. It may be specific or general. All that the law requires is that there is
> a settled purpose. That is not to say that the propositus intends to stay where he is
> indefinitely. Indeed, his purpose while settled may be for a limited period.
> Education, business or profession, employment, health, family or mere love of the
> place spring to mind as common reasons for a choice of regular abode. . . . All
> that is necessary is that the purpose of living where one does has a sufficient
> degree of continuity to be properly described as settled.

*Id.* at 223. The Third Circuit further clarified that "a determination of whether any particular

place satisfies this standard must focus on the child and consists of an analysis of the child's

circumstances in that place and the parents' present, shared intentions regarding their child's

-10-

presence there." *Id.* at 224.  Other circuits have adopted some version of the Third Circuit's

acclimatization and settled purpose test. *See, e.g.*, *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir.

2007); *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003).

      In *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), the Ninth Circuit took a different

approach, which also has been adopted by other circuits.  *See, e.g., Ruiz v. Tenorio*, 392 F.3d

1247, 1252 (11th Cir. 2004), *Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006).  Although finding that

a change in habitual residence requires "an actual change in geography and the passage of a

sufficient length of time for the child to have become acclimatized," *id.* at 1253, the *Mozes*

approach focuses heavily on the subjective intentions of the parents.  The Ninth Circuit

explained that "the first step toward acquiring a new habitual residence is forming a settled

intention to abandon the one left behind," and that the intentions that should be examined are not

those of the child, but rather those of "the person or persons entitled to fix the place of the

child's residence." *Id.* at 1075-76.  The Court delineated three broad categories of cases in which

the persons entitled to fix the child's residence do not agree on where it has been fixed.  *Id.* at

1076-78.  On one side, the Court identified cases where the family as a unit has translocated and

"manifested a settled purpose to change its habitual residence, despite the fact that one parent

may have had qualms about the move." *Id.* at 1076.  In these cases, courts typically find a

change of habitual residence.  *Id.*   On the other side, the Court identified cases where "the

chidl's initial translocation from an established habitual residence was clearly intended to be of a

specific, delimited period." *Id.* at 1077.  While noting that courts generally refuse to find "the

changed intentions of one parent led to an alteration in the child's habitual residence," the Ninth

Circuit nonetheless explained that some periods of time, "though sharply delimited, may be too

long to expect children to live abroad without acquiring habitual residence." *Id.* at 1077, 1077

n.27.  In between these two opposing categories of cases, the Court identified a third category in

which "the petitioning parent had earlier consented to let the child stay abroad for some period

of ambiguous duration."  *Id.* at 1077.  These cases have no clear answer and are fact-dependent.

As the Court explained:

> Sometimes the circumstances surrounding the child's stay are such that, despite
> the lack of perfect consensus, the court finds the parents to have shared a settled
> mutual intent that the stay last indefinitely.  When this is the case, we can
> reasonably infer a mutual abandonment of the child's prior habitual residence.
> Other times, however, circumstances are such that, even though the exact length
> of the stay was left open to negotiation, the court is able to find no settled mutual
> intent from which such abandonment can be inferred.  Clearly, this is one of those
> questions of "historical and narrative facts" in which the findings of the district
> court are entitled to great deference.

*Id.* at 1077-78.  Of particular relevance here, the Ninth Circuit specifically noted that courts

routinely "have found a settled intent in favor of indefinite residence" where "the country in

which it has been agreed the child should spend time was the native country of one of the

parents." *Id.* at 1082 (collecting cases).  The Court explained:

> It is entirely natural and foreseeable that, if a child goes to live with a parent in
> that parent's native land on an open-ended basis, the child will soon begin to lose
> its habitual ties to any prior residence.  A parent who agrees to such an
> arrangement without any clear limitations may well be held to have accepted this
> eventuality.

*Id.* at 1082.

### 2.  Daniel's Motion for Summary Judgment

Daniel argues that, as a matter of law, Flor cannot establish that Mexico is N.C.'s

habitual residence, and accordingly, cannot make her prima facie case of wrongful removal.  For

this reason, Daniel contends, he is entitled to summary judgment in his favor.  The Court

disagrees.

-12-

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). On a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). Here, viewing the facts in the light most favorable to Flor, genuine issues of material fact remain in dispute. In his motion, Daniel argues that he did not agree, orally or in writing, that N.C. would move to Mexico, but rather, by his words and the parties' written agreement, expressed his intent that the United States would remain N.C.'s habitual residence. On the other hand, in her response, Flor argues that the parties in fact orally agreed in June 2010 that she and N.C. would move to Mexico, and that this agreement was memorialized in the November 2010 written agreement. The parties' disagreement as to the circumstances surrounding N.C.'s stay in Mexico creates "questions of historical and narrative facts" that go to the very heart of this Court's habitual residence determination. *Mozes*, 239 F.3d at 1078. The Court must resolve these factual issues before reaching a legal decision as to N.C.'s habitual residence.

Accordingly, it would be improper to grant summary judgment in Daniel's favor based only on the parties' memoranda of law and supporting documentation. His motion for summary judgment thus must be denied. Nonetheless, the Court has considered the summary judgment record, including the parties' arguments at the hearing, in resolving this case.

3.      N.C.'s Habitual Residence is Mexico.

Considering N.C.'s past experiences and the parties' shared intentions, the Court finds

that Mexico is the place where N.C. has been physically present for an amount of time sufficient

for acclimatization, and which has a "settled purpose" from his perspective.  *See Feder*, 63 F.3d

at 224.  Since he was born, N.C. has lived with Flor.  When Daniel and Flor separated, N.C.

continued to live with Flor.  When Flor left for Mexico in June 2010 to look for work and a place

to live, N.C., with Daniel's permission, went with her.  At the time, N.C. was two and one-half

years old.  In November 2010, when Flor told Daniel that she had found a job and would remain

in Mexico indefinitely, Daniel again consented to Flor taking N.C. with her.  At no point did the

parties discuss a specific date on which Flor and N.C. would return to the United States.  Other

than three trips to visit his father, N.C. lived with Flor in Mexico until his retention in the United

States in September 2011, when he was just over four years old.

N.C. speaks only Spanish.  From the time he first arrived in Mexico until his September

2011 trip, N.C.'s grandmother cared for him, at least for part of the day each weekday, and

beginning in January 2011, N.C. attended daycare every weekday morning.  N.C. established a

relationship with his extended family, spending time at social gatherings, and playing with

cousins.  He also established friendships with neighborhood children.  Although he had primary

care physicians in New Mexico as well, N.C. established a relationship with a doctor in Mexico,

whom he saw every month.

N.C.'s fifteen months in Mexico – which, at four years old, was almost thirty percent of

his life – living with the primary caretaker he had always known, surrounded by his extended

family, and speaking the only language he had ever known, was sufficient for him to become

acclimatized.  *See Falls v. Downie*, 871 F. Supp. 100, 102 (D. Mass. 1994) (finding twenty-one

month old child had become "completely accustomed to life in this country and with his father and grandparents" where he had been living in the United States for eight months).[3]  Further, from his perspective, N.C.'s purpose of living in Mexico – to remain with his mother where she had decided to make a life for herself – had a sufficient degree of continuity to be properly described as settled.

Indeed, this is true even if Daniel intended for N.C. to return to the Albuquerque two years later to attend kindergarten,[4] or, indeed, even if Daniel was under the impression that Flor was planning to return to the United States after a short time.  As *Feder* makes clear, one need not intend to stay somewhere permanently, or even indefinitely, so long as "the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Feder*, 63 F.3d at 223.  Accordingly, "*Feder* requires only a degree of settled purpose to accompany the move, even if such purpose is only for a limited period." *Whiting*, 391 F.3d at 549 (holding that shared intent by parents that child live in Canada for period of two years fulfills *Feder* requirement that her move to Canada was accompanied by a degree of settled purpose).  That requirement is met easily here.  Both parents agreed that Flor would return to Mexico for some period of time with N.C.  The amount of time was left open, and Daniel agreed that N.C. should go with Flor.  These arrangements "amounted to a purpose with a sufficient degree of continuity to enable it properly to be described as settled." *Levesque v. Levesque*, 816 F. Supp. 662, 666 (D.

---

3        The fact that N.C. spent some time during this fifteen-month period in Albuquerque does not change this analysis, as "[i]t is clear . . . that an existing habitual residence in a country is not lost by the mere fact of leaving the country for a temporary absence which is intended to be of a short duration."  E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 142.

4        The Albuquerque Public School System requires that a child be at least five years of age prior to 12:01 a.m. on September 1st of the school year in order to enroll in kindergarten.  *See* http://www.aps.edu/aps/Policy/Directives/ENROLLKINDER.html.  N.C. had recently turned three when Flor and Daniel entered into their written agreement in November 2010.

Kan. 1993) (finding child's habitual residence to be Germany despite parties' dispute regarding whether mother and child would return to the United States after unspecified temporary period); *see also Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 200 n.12 (E.D.N.Y.), *aff'd*, 401 F. App'x 567 (2d Cir. 2010) (even crediting father's testimony that parties agreed children were to return from England to the United States after a year and a half or two years living there with their mother, court found that purpose of stay in England had sufficient degree of continuity to be settled, and accordingly, children's habitual residence was England); *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 269 (N.D. Iowa 1993) (finding child's habitual residence to be United States despite mother's intention that child return to Germany at some future date, where court found that no definite time for child's return was set or discussed, and that it was mutual intent of parties that child's stay be of an indefinite nature); *Schroeder v. Vigil-Escalera Perez*, 664 N.E.2d 627, 633 (Ohio 1995) (finding child's habitual residence to be Ohio, despite father's intention for child to return to Spain at some future date, where no definite time for child's return was set or discussed, and it was mutual intent of parties that child be with mother in Ohio for an indefinite amount of time).  For these reasons, under the *Feder* test, the Court concludes that Mexico was N.C.'s habitual residence at the time of his retention in the United States.

The Court reaches the same conclusion under the *Mozes* test.  The circumstances surrounding N.C.'s stay in Mexico are such that, "despite the lack of perfect consensus", the Court finds that Flor and Daniel shared a settled mutual intent that N.C.'s stay in Mexico last indefinitely.  *See Mozes*, 239 F.3d at 1077-78.  First, Flor testified that, before leaving in June 2010, she told Daniel repeatedly that she wanted to move back to Mexico to be with family, and that, if she found a job, she might not return to the United States.  Although Daniel testified to a different version of events, as between the parties, the Court finds Flor to be the more

forthcoming and credible witness, and accordingly, accepts her testimony.  Thus knowing Flor's

intentions, Daniel consented to Flor taking N.C. with her to Mexico.  Next, in November 2010,

Flor advised Daniel that she intended to remain in Mexico, where she had gotten a good job.

Again, aware of Flor's intentions, Daniel consented to N.C. returning to Mexico with Flor at the

end of December.  Further, although the parties' written agreement does not indicate whether it

is intended to provide Daniel with joint physical custody or visitation rights, both parties'

testimony suggest the later.  Flor testified that the agreement was intended to allow N.C. to stay

with her in Mexico and to fix visitation.  Daniel testified that he entered into the agreement in

order to "stay in contact" with N.C. and guarantee that he would "see" his son.  Similarly, the

fact that the agreement provides for a distribution of the parties' assets to Flor and N.C.,

together, and for payment of child support by Daniel to Flor, suggests that the parties intended

for Flor to retain primary physical custody of N.C.  Accordingly, the Court finds that the written

agreement provided for N.C. to live with Flor in Mexico, and visit Daniel for one-month periods,

every two months, for an indefinite length of time.  Finally, because Mexico is Flor's native

country (and indeed, Daniel's as well), it was a "natural and foreseeable consequence" of

Daniel's agreement to allow N.C. to live there with Flor that N.C. would lose his habitual ties to

the United States.  *Id.* at 1082.  Considering all of these factors, the Court finds that Flor and

Daniel shared a settled mutual intent that N.C.'s stay in Mexico last indefinitely.  As this is the

case, the Court infers a mutual abandonment of N.C.'s prior habitual residence in the United

States.  *See id.*

        Daniel's stated intention that N.C. return to Albuquerque to attend kindergarten does not

change this analysis.  Flor and N.C. left for Mexico in June 2010.  Daniel is not eligible to begin

kindergarten until September 2012.  Accordingly, even if the parties shared a settled mutual

intent that N.C.'s stay in Mexico last for two years, this period is too long to expect N.C. to live abroad – in his parents' native country – without acquiring habitual residence.  *See id.* at 1077 n.27.  Under the *Mozes* test, the Court thus concludes that Mexico was N.C.'s habitual residence at the time of his retention in the United States.

The Court notes that its determination regarding N.C.'s habitual residence is further supported by the fact that Daniel has no legal status in the United States.  "An unlawful or precarious immigration status . . . is [] a highly relevant circumstance where, as here, the shared intent of the parties is in dispute."  *Id.* at 1082 n.45.  Although N.C., himself, is a United States citizen, he is only four years old, and thus needs to rely on the stability of his primary caretaker for several years to come.  Unfortunately, Daniel is unable to offer that stability.  Accordingly, although not determinative of this Court's decision, Daniel's status is a factor weighing in favor of finding Mexico to be N.C.'s habitual residence.  *See Alonzo v. Claudino*, No. 1:06CV00800, 2007 WL 475340, *5 (M.D.N.C. Feb. 9, 2007) (holding that where a party is in the United States illegally, "there cannot be the 'degree of settled purpose' required to establish habitual residency in the United States"); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 552 n.9 (E.D. Pa. 2010) (holding that respondent's "somewhat uncertain asylum status weighs against finding the United States as the children's habitual residence," and noting that "courts have found that the threat of deportation is a constant danger to a child's well-being, potentially undermining every connection to his or her community").

B.    Custodial Rights

"[T]he Convention calls into play a State's choice of law rules as well as its internal custody rights laws."  *Feder*, 63 F.3d. at 225.  Mexican choice of law rules would require that Mexico apply the law of the State in which the child was habitually resident immediately prior to

the child's retention.  *Whallon v. Lynn*, 230 F.3d 450, 456 n.6 (1st Cir. 2000).  Here, N.C.'s

habitual residence at the time of retention was the State of Chihuahua, Mexico.  Accordingly, the

law of Chihuahua, Mexico governs the decision as to whether Flor had custody rights at the time

Daniel retained N.C. in the United States.  *Id.*

Title Eighth of the Civil Code for the State of Chihuahua contains several provisions

defining the scope of parental authority/responsibility, or *patria potestas*.  Under this Title, the

Code provides that parental authority/responsibility over children will be exerted by the father

and mother.  Civil Code, Art. 391(I.).  Further, the Code provides that in the event of a

separation between the parents, both parents are required to continue fulfilling their obligations,

and may agree upon the terms of its exertion, particularly in all things concerning the care and

custody of the minors.  *Id.* Art. 393.  In the case of disagreement between separating parties, a

judge will decide the matter.  *Id.*  The Code specifies that those who exert parental

authority/responsibility have a right to coexist (spend time) with their children, even if they do

not have custody, unless it represents a danger to the child.  *Id.* Art. 394.  Further, the Code

provides that as long as the child is under parental authority/responsibility, he shall not leave the

house of those who exert it without their permission.  *Id.* Art. 398.  Finally, the Code provides

that the abduction or retention of the minor outside of his habitual residence without the

permission of those exerting parental authority/responsibility or custody grants the right to

initiate the restitution procedure contemplated in the Code of Civil Procedure.

The doctrine of *patria potestas* set forth in the Code "implies a meaningful, decision

making role in the life and care of the child."  *Whallon*, 230 F.3d at 458.  Accordingly, the rights

of parental authority/responsibility afforded to Flor, as N.C.'s mother, pursuant to these Code

provisions is sufficient to establish that she had rights of custody for purposes of the Hague

Convention.  *See id.*; *Avendano v. Smith*, 806 F. Supp. 2d 1149, 1173 (D.N.M. 2011) (citing

*Altamiranda Vale v. Avila*, 538 F.3d 581, 586-87 (7th Cir. 2008)).  Under the Code, Flor had the

right to exert parental authority/responsibility, and the right to spend time with N.C.  Daniel

violated those rights by retaining N.C. in Albuquerque after the date upon which the parties

agreed N.C. would be returned to Mexico.  Assuming the Mexican courts would honor the

parties' agreement here, Daniel was in violation of that agreement when he retained N.C.

Further, Daniel retained N.C. outside of his habitual residence without Flor's permission, thus

violating the Code.  Accordingly, the Court finds that Daniel's unilateral decision to retain N.C.

was in breach of Flor's custody rights under the laws of N.C.'s habitual residence at the time of

his removal.[5]

        C.     <u>Exercise of Custodial Rights</u>

The Court "liberally find[s] "exercise" whenever a parent with *de jure* custody rights

keeps, or seeks to keep, any sort of regular contact with his or her child."  *Friedrich*, 78 F.3d at

1067.  Accordingly, "if a person has valid custody rights to a child under the law of the country

of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under

---

[5]      In his motion for summary judgment, Daniel argues that Flor cannot prove that she had rights of custody under Mexico law.  In support of this argument, Daniel states that because the parties entered into a "parenting" agreement while in New Mexico, Flor's custody rights are dictated by New Mexico law.  Daniel's argument ignores the mandate of the Hague Convention that the Court apply the law of the State in which N.C. was habitually resident immediately prior to his retention, *i.e.*, the State of Chihuahua, Mexico.  Further, the parties' agreement is not part of a legal custody order or court decree, and thus there is no reason to doubt that the parental authority/responsibility laws of Mexico, as set forth in the Code, govern here.  Indeed, even if the parties' agreement were part of a court order, Daniel is in breach of that agreement.  There is nothing in that agreement indicating that Flor does not continue to share equal rights of custody to N.C.  In fact, to the contrary, as discussed above, the intent of the agreement was to give physical custody of N.C. to Flor, with visitation rights to Daniel.  Under these circumstances, Daniel would be hard-pressed to show that his retention of N.C. did not breach Flor's custody rights.

the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  *Id*.

The evidence demonstrates that, far from abandoning her child, Flor was living with and caring for N.C. in Mexico.  Although, pursuant to the parties' agreement, she sent N.C. to spend the month of September with Daniel, she intended to continue to live with and care for Daniel upon his expected return at the end of the month.  Accordingly, the Court finds that Flor was exercising her custodial rights at the time of Daniel's retention of N.C. in the United States.

D.    Conclusion

Flor established by a preponderance of the evidence that Mexico is N.C.'s habitual residence, that Daniel's retention of N.C. in the United States was in breach of Flor's custody rights under Mexican law, and that Flor was exercising her custody rights at the time of retention.  Accordingly, Flor made a prima facie case of wrongful retention.  The burden thus shifted to Daniel to establish a defense.  Daniel, however, did not assert any defense to Flor's prima facie case of wrongful retention.  Accordingly, the Court must order the return of N.C. to Mexico.

III.    Award of Fees and Costs

The ICARA provides for an award of fees and costs to prevailing parties in an action brought pursuant to the Hague Convention.  Specifically, the ICARA states:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3).  Accordingly, if Flor chooses to pursue her request for costs and fees, she is directed to file a motion complying with the requirements of D.N.M. LR-Civ 54.5 within thirty days of entry of this Order.

## CONCLUSION

Daniel failed to establish that, based on the undisputed evidence, he was entitled to a judgment as a matter of law.  On the other hand, based on all of the evidence, Flor established by a preponderance of the evidence that Daniel's retention of N.C. in the United States was wrongful.  Because Daniel presented no defense to his retention of N.C. in the United States, N.C. must be returned to Mexico.  If she wishes to pursue her motion for costs and fees, Flor shall file a motion within thirty (30) days of entry of this Order.

**IT IS THEREFORE ORDERED** that the Petition for Return of Child to Petitioner [Doc. 1] is granted, as follows:

(1)     N.C. shall be returned to Mexico.  As Flor is unable to travel to the United States and Daniel is unable to travel to Mexico, Daniel shall release N.C. to the custody of Flor's sister, Raquel no later than 5:00 p.m. on May 29, 2012.  Flor shall make arrangements for her mother or her sister to bring N.C. to Mexico.  N.C.'s travel documents are available to be picked up by Flor's attorneys at the Clerk's Office, United States District Courthouse, 106 South Federal Place, Santa Fe, New Mexico.

(2)     Pursuant to this Court's jurisdiction under 42 U.S.C. Section 11603(a) to vindicate rights arising under the Hague Convention, in order to effectuate N.C.'s return to Mexico as ordered herein, the Temporary Domestic Order entered by the Second Judicial Court, County of Bernalillo, State of New Mexico, on November

15, 2011, in *Carrillo-Castro v. Carrasco*, DM 2011-1415, is hereby vacated to the extent that it prohibits removal of N.C. from the State of New Mexico without Daniel's consent.

**IT IS FURTHER ORDERED** that Respondent's Motion for Summary Judgment and Supporting Memorandum [Doc. 20] is denied.

**IT IS FURTHER ORDERED** that, if Flor wishes to pursue her motion for costs and fees, within thirty (30) days of entry of this Order, Flor shall file a motion, pursuant to 42 U.S.C. Section 11607(b)(3).  The motion shall comply with the requirements of D.N.M. LR-Civ 54.5.

DATED this 29th day of May, 2012.

_____
MARTHA VÁZQUEZ
United States District Court Judge

-23-